OPINION BY JUDGE DAVID BARTON I.INTRODUCTION Respondent David W. Tidd was elected a magisterial district judge (MDJ) in Northampton County during 2009 and took office on January 4, 2010. He was reelected in 2015, and resigned six months into his second term on July 26, 2016. After receiving complaints and conducting an investigation, the Judicial Conduct Board (Board) filed its formal complaint with this Court on August 26, 2016. In its complaint (Complaint) the Board alleges that Judge Tidd violated 13 separate provisions of the Pennsylvania Constitution or Rules Governing Standards of Conduct of Magisterial District Judges[1] (MDJ Rules) as follows: 1. Retaliation: New Rule 2.16(B) (“shall not retaliate, directly or indirectly, against a person known or suspected to have assisted or cooperated with an investigation of a magisterial district judge or lawyer”); 2. Improper Demeanor: (A) Old Rule 4(C) (“MDJs shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom they deal in their official capacity .,.,”); and (B) New Rule 2.8(B) (same); 3. Ex Parte Communications: (A) Old Rule 4(D) (“shall ... neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding”); (B) New Rule 2.9(A) (same); 4. Special Consideration: (A) Old Rule 2(A) (“Impropriety and Appearance of Impropriety to be Avoided”); (B) New Rule 1.2 (“Promoting Confidence in Judiciary”); (C) New Rule 2.4 (“External Influences on Judicial Conduct”) (“shall not permit family, social, political ... or other interests or relationships to influence ... judicial conduct or judgment”); 5. Failure to Recuse: (A) Old Rule 8(A)(1) (MDJ “shall disqualify themselves in a proceeding in which their impartiality might be reasonably be questioned”); (B) New Rule 2.11(A)(1) (same & where personal bias or prejudice concerning a party); 6. Failure to Accord Full Right to Be Heard: Old Rule 4(D) (“shall accord to every person who is legally interested ... full right to be heard according to. law”); New Rule 2.6(A) (same); 7. Conflicts of Interest: (A) Old Rule 14(A) (“shall not act as a lawyer in a proceeding in which they have served as MDJ or in any other proceeding related thereto”); New Rule 3.10(A) (same); 8. Failure to Prioritize Business of the Court: Old Rule 3 (“shall devote the time necessary for the prompt disposition of the business of their office, which shall be given priority over any other occupation, business, profession, pursuit or activity”); 9. Failure to Wear Judicial Robes: (A) Old Rule 4(B) (“shall wear judicial robes while conducting hearings and trials”); (B) New Rule 2.8(A) (same); 10. Disregard for Dignity of Judicial Robes:' (A) Old Rule 2(A) (“shall conduct themselves ... in a manner that promotes public confidence in the integrity and impartiality of the judiciary”); (B) New Rule 1.2 (same); 11. Article V, § 17 (b) of Constitution of. Pennsylvania, “shall be governed by rules or canons which shall be prescribed by the Supreme Court”; 12. Article V, § 18 (d)(1) of Constitution of Pennsylvania, “conduct which prejudices the proper administration of justice”; 13. Article V, § 18 (d)(1) of the Constitution of Pennsylvania, “conduct which brings the judicial office into disrepute.” Numerous motions were filed following the filing of the Complaint. On September 14, 2016, Respondent filed a motion seeking discovery and an omnibus motion. The Omnibus Motion raised five claims for relief: recusal of the ■ conference judge assigned to this case; the dismissal of all charges based on violations of the Pennsylvania Wiretap Law; dismissal of such allegations as would be barred by the applicable statute of limitations and premised upon the equitable concept of laches; dismissal of charges “based on setting up all persons who worked for David Tidd against him;” and failure to state a cause of action. A status conference was held on October 7, 2016, to address the motion seeking recusal of the conference judge. The Respondent attended and testified concerning the basis for this motion. At the conclusion of the status conference, both Respondent and his counsel agreed there was no basis for recusal. Nonetheless, a single judge decision was filed on October 12, 2016, denying Part I of the Omnibus Motion to the extent it had not already been withdrawn. (See Single J. Dec. and Stmt. Of Reasons, 10/12/2016). By Order of October 26, 2016, Parts II (seeking dismissal for wiretap violations), III (seeking dismissal based oh Statute of Limitations), and IV (seeking dismissal based on setting up all persons who worked for Respondent against him) of the Omnibus motion were denied, Part V (demurring to certain allegations) was denied without prejudice to be renewed at the conclusion of trial. Following several other motions and a pretrial conference, trial before a panel of this court[2] was held on January 18-20, 2017, May 3-5, 2017, and June 8, 2017. Following trial the parties weré ordered to submit proposed findings of fact and conclusions of law. Respondent submitted the same on July 13, 2017, and the Board did so on August 11,2017. During seven days of trial in this matter the Board called 14 witnesses. Respondent Judge Tidd called 17 witnesses in his defense. The Board introduced 177[3] documentary exhibits, and Respondent Judge Tidd introduced 21 documentary exhibits. All such exhibits were admitted into evidence without objection.[4] . II. LEGAL STANDARDS . The Preamble to the Rules Governing Standards of Conduct of Magisterial District Judges (2014) states that “[a]n independent, fair, honorable and impartial judiciary is indispensable to our system- of justice.” R.G.S.C.M.D.J., Preamble. Our Supreme Court has adopted the various rules of judicial discipline, including the MDJ Rules, to discharge its obligation to “conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system ... for the protection of the Citizens of this Commonwealth.” In re Bruno, 627 Pa. 505, 101 A.3d 635, 675 (2014). The Court of Judicial Discipline has original jurisdiction over actions alleging judicial wrongdoing prosecuted by the Judicial Conduct Board. See Pa. Const, art. V, § 18(b)(5); In re Bruno, 627 Pa. 505, 101 A.3d 635 (2014). Because such proceedings are quasi-criminal, respondent judges are afforded the same constitutional rights as are criminal defendants. .The Board must prove the charges by clear and con-. vincing evidence. In re Sullivan, 135 A.3d 1164, 1172 (Pa. Ct. Jud. Disc. 2016). Clear and convincing evidence has been defined as evidence “that is so clear, direct, weighty, and convincing as to enable the trier .of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.” In re Eakin, 150 A.3d 1042, 1046 (Pa. Ct. Jud. Disc. 2016) (quoting Matter of Sylvester, 521 Pa. 300, 555 A.2d 1202, 1203-04 (1989)). The Court of Judicial Discipline considers facts that are stipulated to by the parties as facts that have been proved by the party having the burden of proof by clear and convincing evidence. Id. at 1047. “Credibility, of witnesses and the weight of evidence is within the province of the trier of fact, who is free to believe all, part or none of the evidence.” Commonwealth v. Scott, 146 A.3d 775, 777 (Pa. Super. 2016). Because the conduct at issue here occurred during Judge Tidd’s judicial service, the jurisdiction of'the Board, and this Court, continues regardless of his resignation! In re Miller, 171 A.3d 367 (Pa. Ct. Jud. Disc. 2016); In re Ciavarella, 108 A.3d 983, 987 (Pa. Ct. Jud. Disc. 2014). III. DISCUSSION A. Retaliation. Judge Tidd became aware of a judicial conduct investigation being conducted by the Board in March or April of 2015. (N.T. 6/08/17, p. 18). The Board later issued a Notice of Formal Investigation (NOFI) on February 19, 2016, which Judge Tidd received on the same day (N.T. 6/8/17, p. 5). The NOFI plainly and prominently informed Judge Tidd that retaliation or adverse action against a staff member could subject him to discipline under Canon 2, Rule 2.16(b). Ultimately, the Board’s Complaint was filed in this Court on August 26, 2016. The Board alleges multiple instances where Judge Tidd retaliated in violation of Rule 2.16. We address only those allegations in which we find the evidence presented supports an arguable, cognizable charge of retaliation. (1) The Board has alleged that Judge Tidd violated the provision against retaliation when he approached his judicial employees after becoming aware of the Board investigation in response to complaints concerning his conduct. In particular, at trial the Board introduced as Exhibit 12-B the video/audio recording made by court equipment on April 23, 2015, which reveals that Judge Tidd entered the court facility in the afternoon and locked the door behind him. Thereafter Judge Tidd proceeded to forcefully berate the court clerks about complaints made to the Board concerning his treatment of them, and also demanded to know who was communicating with his political opponent in the upcoming May 19 primary election (N.T. 1/20/17, p. 430). We find the following as the facts necessary for the determination of these charges:[5] Judge Tidd’s first elected term was to end in January, 2016. During 2015 he was a candidate for a second term, and in May of 2015 was facing a contested primary election. Ultimately, Judge Tidd was elected to a second term by the electorate of his magisterial district. In the weeks and months leading to the May, 2015 primary election, Judge Tidd’s office manager and clerk, Brenda Anthony, telephoned the candidate running against Judge Tidd in the election on several occasions. Anthony had requested a transfer to a different district court by letter of December 3, 2014, sent to Assistant Court Administrator Debbie French (ACA French). Judge Tidd received information from a third party that someone in his office was communicating with his political opponent. On April 23, 2015, Judge Tidd entered his judicial office and locked the front door thereby preventing the public from accessing the facility. During this time his staff was not prevented from leaving, and an additional exit was available to them. Judge Tidd forcefully berated the clerks about complaints of his conduct and inquired regarding who was speaking with his election opponent. Brenda Anthony denied having spoken with his election opponent. Anthony’s statement in this regard was untrue. Judge Tidd’s court had a video recording system to which audio recording capability had been added in October, 2013. Judge Tidd’s staff saved four instances of video/audio recordings from the Court’s video/audio system. The staff jointly kept notes concerning Judge Tidd beginning in 2012, and later forwarded those notes to ACA French on many occasions. The staff jointly decided which video/audio recordings to retain, and recordings not so retained were overwritten by the recording system. On Primary Election Day, May 19, 2015, Brenda Anthony telephoned Judge Tidd shortly after 9:00 a.m. to inform him that several cases remained scheduled for trial that morning. Judge Tidd was angry that his staff had scheduled trials on the day of his election contest and returned to the Court immediately following Anthony’s telephone call. There was one case ready to proceed, and Judge Tidd took one negotiated guilty plea in a traffic case. He also telephoned ACA French concerning continuing any other cases for the day. Our findings of fact continue: Judge Tidd met with President Judge Kimberly McFadden in August of 2012 concerning potential law practice conflicts and Judge Tidd’s decorum in the district court facility. After Judge McFadden’s five year term as ^president judge ended, Judge Stephen Barratta became president judge of Northampton County. Judge Tidd requested a meeting with President Judge Barratta concerning his judicial staff, but later withdrew his request for a meeting following Judge Barratta’s request for documentary evidence in support of Judge Tidd’s claims. During April, 2016, Judge Tidd decided to reallocate all of his active arrest and bench warrants to Constable Richard Seeds. Because of prior difficulties with Constable Seeds, Judge Tidd’s staff was resistant to this directive, and contacted ACA French at the administrative office. Ms. French directed them to work on the transfer of warrants as their time permitted. The Board issued a Notice of Formal Investigation (“NOFI”) to Judge Tidd on February 19, 2016, which he received that day. The NOFI included language in bold type cautioning the recipient not to retaliate. In a subsequent conversation, Judge Barratta also warned Judge Tidd not to retaliate following the Board’s issuance of the NOFI. (2) The Board also alleges that Judge Tidd’s later requests to the Northampton County Court Administrator to transfer certain employees constituted prohibited retaliation. We find as fact the following additional facts with regard to this allegation: On June 18, 2015, Judge Tidd emailed ACA French in the Northampton County Court Administrative Office asking to have- Brenda Anthony transferred. (Bd. Exh. 21). Judge Tidd’s request lists two reasons for the transfer: first, that Anthony had assisted in the filing of a complaint against him with the Board; second, that she had provided confidential information to his political opponent.[6] At the time, ACA French was aware of the Board’s ongoing investigation of Judge Tidd and recommended that Anthony be transferred.’ Judge Tidd also requested the transfer of two clerks, Traci Drayton and Cassandra Bettler, on May 8, 2016, listing as his reasoning for why they should be transferred their insubordination concerning re-issüing arrest warrants to Constable Seeds and providing information and documents to the Board concerning its investigation of -him. ACA French testified that' Clerk Diane Kale was transferred because of prior instances of insubordination. (3) The Board alleges that following his receipt of the NOFI on February 19, 2016, Tidd went to the Court and confronted a clerk whom he concluded had provided information to the Board. We find as additional facts the following: On February 19, 2016, Judge Tidd went to the district court and confronted Clerk Cassandra Bettler concerning her cooperation with the Board’s investigation of his conduct.'Judge Tidd directed Ms. Bettler to secure coverage for a particular night duty assignment, and stated “I can take a lot of things, but I can’t take' a liar.” During these periods Judge Tidd believed that he had a good relationship with his judicial staff; He hired Brenda Anthony’s daughter, Amber Glass, as a court clerk; he loaned money to staff members on several occasions in times of need; and he engaged in ordinary office conversation and banter. Although Judge Tidd had concerns about Ms. Bettler’s competency, otherwise he felt his staff was competent. In a meeting with ACA French and Judge Bar-ratta, Ms. Bettler declined the opportunity to be transferred to another office because “... it would be unfair to the other clerks.” She had also expressed that she did not want to transfer offices because Judge Tidd’s court facility was closest to her home. MDJ Rule 2.16(B) provides: “A magisterial district judge shall not retaliate, directly or indirectly, against a person known or suspected to have assisted or cooperated with an investigation of a magisterial district judge or a lawyer.” This case requires us. to determine whether Judge Tidd’s confrontations of his staff, and his later occurring requests for transfers, constitute “retaliation” for the purposes of Rule 2.16(B). What constitutes retaliation is a matter of first impression for this Court.[7] The Preamble to the Rules provides that the Rules: are rules of reason that should be applied consistently with constitutional requirements, statutes, other court rules, and decisional law, and with regard to all relevant circumstances. The Conduct Rules are to be construed as to not impinge - on the essential independence of magisterial district judges in making judicial decisions. Preamble, Rules Governing Standards of Conduct of Magisterial District Judges, 42 Pa. C.S. “The Code of Judicial Conduct and MDJ Rules do not expressly provide that the Canons and Rules must be read in consonance with the [Statutory Construction] Act,[8] but because the Act collects fundamental precepts of construction, it provides the logical starting point for our analysis.” In re Carney, 621 Pa. 476, 79 A.3d 490, 501 (2013), Retaliation is not defined in the Judicial Canons or the Rules Governing Standards of Conduct for Magisterial District Judges. Where a term is not defined, we look to the word’s meaning through its common and approved usage. However, “technical words and phrases and such others as have acquired a peculiar and appropriate meaning... shall be construed according to such peculiar and appropriate meaning or definition.” 1 Pa. C.S. § 1903(a). Whether conduct constitutes retaliation has been considered in a myriad of cases before our state and federal judicial systems, most commonly in the context of employment protection statutes.[9] In the case of Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) the U.S. Supreme Court discussed how the substantive employment protections of Title VII differ from its anti-retaliation provisions and the separate purposes served by each. In holding that while. Title VII protects from discrimination in the workplace and requires an “adverse employment action,” the anti-retaliation provision requires, a broader interpretation to achieve its purpose of preventing harmful actions against an employee for initiating a discrimination complaint, Id. at 67, 126 S.Ct. 2406. The Court held that the anti-retaliation provision is violated when an employer takes an action that would deter a reasonable employee from pursuing relief under the protective statute.[10] However, the Court notes that the anti-retaliation provision “protects an individual not from all retaliation, but from retaliation that produces an injury or harm.” Id. “We speak of material adversity because we believe it important to separate significant from trivial harms. Id. at 68, 126 S.Ct. 2405. (italics in original). In assessing how to determine whether claimed retaliation is sufficiently serious to support a violation for retaliation, the Court stated that Title VII does not set forth “a general civility code for the American workplace.” Id. (quoting Orncale v. Sundowner Offshore Services, Inc., 623 U.S. 76, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The court went on to further state that petty slights, minor annoyances, and simple lack of good manners do not deter employees from pursuing complaints. This analysis is conducted using an objective standard, and depends on the particular circumstances. Id.[11]. We think this framework' provides a sound basis to analyze whether 'a jurist has violated Rule 2.16(B) by taking actions which could be considered retaliatory against a person who has filed a complaint with the Board. In construing the Canons and MDJ Rules to effect their purpose we can easily conceive of situations where an offending judge could take actions that would deter judicial staff from cooperating with a Board investigation. Judge 'Tidd’s jarring and angry confrontations of his staff concerning the complaints to the Board about his treatment of staff cross that line and we find they would deter a reasonable employee from maintaining or cooperating with a judicial discipline investigation. Wfe note, however, that no threats were expressed or implied by Judge Tidd, and we are unconvinced that the Board’s witnesses had any genuine concern that Judge Tidd would take adverse employment' action against :them. Moreover, because at least one court employee voluntarily became involved in the political process by secretly communicating with Judge Tidd’s political opponent in the weeks and months leading up to a contested primary election,[12] we find this witness’s testimony to be biased, and that this bias has pervasively tainted all of the other allegations made by Judge’s Tidd’s office staff. Judge Tidd’s confrontations of his staff in a caustic manner do not strike us as being motivated by an intent to dissuade cooperation or involvement with a judicial disciplinary investigation. However, under the objective standard that we use to determine whether conduct constitutes retaliation, intent is not required. Because Judge Tidd’s angry confrontation of his judicial staff was inappropriate conduct for any judge in Pennsylvania, and would deter a reasonable employee from cooperating with the Board, it constitutes a violation of Rule 2.16. Second, the Board alleges that Judge Tidd’s requests to transfer certain employees to other district courts constitutes prohibited retaliation. However, Clerk Brenda Anthony had already requested a transfer on December 3, 2014, prior to Judge Tidd’s request that came on June 18, 2015. (N.T. 1/20/17, p. 527-528). We see no retaliation as to her where Anthony had already requested a transfer. Judge Tidd had also requested Clerk Diane Kale, who by this point in time had retired and was periodically assigned as a floater clerk in various MDJ offices, not be assigned to his office because he believed she took part in filing a complaint with the Board. ACA French testified that Kale was transferred for other insubordinate conduct. We are unable to conclude that Judge Tidd’s request that she not be assigned to his court would reasonably deter her from cooperating with the Board. Accordingly, we see no violation here as to Clerk Kale. Significantly, Judge Barratta testified that whether or not to transfer clerks was a decision of the President Judge of Northampton County, and one for which he required a substantial and legitimate reason. Because Judge Tidd’s requests were just that — requests—and not actual employment decisions, we conclude that his mixed-motive requests to transfer Drayton and Bettler which did not result in any adverse employment decisions, do not constitute retaliation under Rule 2.16. B. Improper Demeanor, Ex Parte Communications, Failure to Accord Full Right to Be Heard[13] Broadly stated, the allegations against Judge Tidd relating to ex parte communications and failure to accord full right to be heard arise from Judge Tidd’s relative informality in conducting many court proceedings. Tidd’s staff testified that plea negotiations, mostly in traffic cases, occurred at a counter in the reception area. They also testified that nearly every traffic trial would take place at the same counter,[14] and that many discussions occurred between the judge and one litigant where the other litigant had not yet arrived or was late. We find as fact the following: Judge Tidd testified credibly that while most negotiations were with all parties present there were instances of a police officer being late where he would discuss with a defendant whether the defendant wished to have a trial or was only seeking a reduced offense to which they would agree to plead guilty. Judge Tidd explained that on occasions where he would converse with an officer outside the presence of a defendant-motorist, the conversations related to whether the officer anticipated holding a trial or whether the case was likely one to be resolved by negotiated plea so long as the defendant was amenable. Judge Tidd also related that due to the configuration of his court facility and the small size of his courtroom, many administrative activi- ■ ties were conducted at the counter. Every judge in our Commonwealth recognizes the right of every litigant to receive a fair and impartial trial before an unbiased finder of fact. This is true, of course, whether the trial be one for a minor traffic offense, a more serious criminal charge, or a civil dispute. We also think that every judge would also acknowledge that engaging in any ex parte conversation on the day of trial, even concerning the Court’s time and schedule, is attended with a serious danger of creating an appearance of impropriety. We also acknowledge that the facilities provided to our Magisterial District Judges are commonly less than ideal, and typically are not designed to modern standards for courtroom work-flow and overall safety. Judge Tidd testified that his courtroom could only be accessed from his chambers by passing through the often-crowded public waiting room. Therefore, he conducted various procedural steps such as continuances, waivers of criminal case preliminary hearings, and guilty pleas to lesser traffic offenses, at the clerks’ transaction counter of his facility. We also observe that the courts of this Commonwealth conducted their business in the days before electricity and often with impractical facilities, yet still maintained the dignity of proceedings through appropriate formality. Significantly, the systematic use of these basic formalities, such as the use of what courtroom is provided, and the wearing of a robe (that is mandated by Rule 2.8(A)), serve to reinforce the authority of our court system generally and of the individual judges particularly. The courtroom setting also aids in accomplishing practical results, including the avoidance of a judge conversing with litigants in the absence of all parties. While we understand Judge Tidd’s motivation for conducting as much business as was done at the counter rather than inside of his courtroom, we view it as being an incorrect shortcut that fails to reinforce the authority of our judicial branch of government. We also credit the numerous witnesses presented by Judge Tidd, including respected members of the bar, concerning the conduct of actual evidentiary proceedings inside of his courtroom, and that he was viewed as a fair and competent judge in such proceedings. Numerous attorneys testified to proceedings inside of the courtroom where they also noted that Judge Tidd was clothed with his judicial robe. We discount the credibility of the Board’s witnesses who testified, variously, as to what occurred at the counter as being trials yet seeing no witnesses sworn to' give testimony.[15] This Court concludes that the conferences and conciliation discussions that occurred there were not trials. Rather, they were commonly plea negotiations, or in civil and landlord-tenant cases discussions among the parties and judge that resulted in agreed-upon dispositions. Significantly, no testimony was presented by the Board identifying any case that was conducted at the counter where the documented result was reflected by a docket entry of “Guilty-[after] Trial,” and indeed most of the testimony concerning these instances focused on guilty pleas to reduced traffic offenses. Although subject to the concerns that we express herein, we find that the Board has failed to establish by clear and convincing evidence that Judge Tidd violated Old Rule 4(D) or New Rule 2.9(A) relating to ex parte communications, nor do we see a violation of Old Rule 4 (C) and New Rule 2.8(b), relating to demeanor, as to this same conduct.[16] Likewise we are not able to conclude by clear and convincing evidence that Judge Tidd’s actions failed to accord litigants their full right to be heard, as alleged" in Count 6 of the Complaint. C. Failure to Recuse, and Special Consideration . The Board also contends that Judge Tidd violated Rules 1.2, 2A, 2.4(B) & (C), in connection with Attorney James Burke (Burke). We find as fact the following: Burke received seven parking tickets between January, 2010, and January 19, 2016, a five year period. He did not always timely respond to them, and in some instances those cases were scheduled for the issuance of an arrest warrant due to Burke’s failure to respond. Judge Tidd directed his staff in several cases to telephone Burke to obtain compliance. Judge Tidd also shared lunch with Burke on approximately five occasions and spoke with him by telephone periodically. The Board infers the above-listed violations because Judge Tidd has known Attorney Burke for 13 to 15 years, Burke and Judge Tidd had lunch together on approximately five occasions, Judge Tidd spoke with Burke by telephone regularly, and that Judge Tidd afforded Burke “special treatment” concerning several parking tickets. At trial, Clerks Anthony and Kale testified that Judge Tidd told them to contact Burke rather than issue' arrest warrants for several unpaid parking tickets. The Board also alleges that Judge Tidd improperly exercised, his discretion in assessing constable costs related to certain arrest warrants issued for Burke on Northampton County rather than imposing them on Burke. The Board posits that if these cases had proceeded and arrest warrants had been issued, Burke would have been subject to increased costs. Because this practice was not extended to others, the Board infers that Judge Tidd- gave Burke improper, preferential treatment. However, Judge Tidd testified in a deposition with the Board prior to trial that he extended additional periods of time to other litigants who requested the same in order to pay fines and costs. Further, because Judge Tidd did not recuse himself on cases involving Burke, including cases where Burke served as counsel, the Board contends that he violated: Old Rule 8A(1) (judges “shall disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where ... (1) they have a personal bias or prejudice concerning a party;” and New Rule 2.11(A)(1) (same)). The Board also references other cases where Judge Tidd’s staff perceived that the judge had a conflict of interest that would preclude him from hearing cases. One of those cases was a traffic ticket issued to the owner of the building leased to Northampton County in which Judge Tidd’s District Court facility was located. Judge Tidd admits directing the staff to contact Burke in an effort to avoid the need for issuing arrest warrants to enforce the collection of fínes and costs due the Court, and that this was done as a courtesy to a member of the local bar. Because Judge Tidd testified in his Board deposition that payment extensions were available to others, we do not view the accommodation extended to Attorney Burke as special consideration. Further, wfe decline to view Judge Tidd’s acquaintance with Attorney Burke as requiring recusal, whether in cases where Attorney Burke represented litigants, or in those involving Burke himself. We find that the Board has not proven these allegations by clear and convincing evidence. We see no violation with a judge having contact with members of the bar, including periodically meeting for lunch, so long as the jurist is satisfied that the criteria for recusal permits he or she to adjudicate any particular .case.[17] Indeed, if that were the case, our judges would be forced live in isolation avoiding contact with other members of their profession. Such a limitation is an unrealistic and unworkable proposition.[18] Moreover, Judge Tidd was responsible for the collection of fines and costs on Burke’s parking tickets, and whether he obtained compliance through a telephone call or issuing an arrest warrant, we see no ethical violation with a locally elected judge obtaining compliance ' through occasional ■ informal means.[19] We further credit Judge Tidd’s testimony which we find to be honest, forthright, clear, and direct, that he was able to, and did, adjudicate these matters, including those in which Attorney Burke was involved, fairly and impartially. D. Conflicts of Interest and Failure to Prioritize Business of the Court In Count 7, the Board alleges that Judge Tidd violated Old Rule 14A when, in his capacity as an attorney, he had involvement with cases that were pending or impending in his magisterial district in which he took, or had taken, judicial action. Additionally, the Board alleges that Judge Tidd violated New Rule 3.10(A).[20] Count 8 alleges that by these same acts Judge Tidd failed to prioritize his judicial duties over his outside activities, in violation of Old Rule 3.[21] As proof of these violations, the Board cites, inter alia, the civil case of Society Hill at Saucon Valley v. Maria Nieves, Docket No. MDJ-03204-CV-134-2010, where Judge Tidd entered a default judgment[22] on October 1, 2010. Maria Nieves had been a client at Judge Tidd’s former law firm in a Chapter 13 Bankruptcy case that began in 2006 and ended in 2011. Judge Tidd first took office in January, 2010. The entry of a default judgment in the Courts of Common Pleas is done by the Prothonotary rather than a judge, who “acts in a ministerial, and not a judicial capacity....” Maiorana v. Farmers & Merchants Bank, 319 Pa.Super. 338, 466 A.2d 188, 190 (1983). Our magisterial district judges have neither clerks of court nor prothonotaries to maintain their records. Instead, they are vested with the responsibility not only to adjudicate cases, but also to serve as the judicial record keeper while being subject to regular audit for their performance of these duties. Judge Tidd testified credibly that he first learned of the Nieves conflict when opposing counsel reported it to the Northampton County Court Administrative Office, and that he immediately dropped Ms. Nieves as a client and had the case transferred to another district court. (N.T. 6/08/17, p. 80-81). The Court notes that the Nieves matter was a Chapter 13 bankruptcy which began in 2006, four years prior to Judge Tidd taking office and there likely would have been little, if any, attorney involvement during the five year repayment plan typical for Chapter 13 bankruptcies. See 11 U.S.C. § 1322(d). We are further satisfied that the act complained of here was an isolated incident and, while preventable, was handled appropriately once the actual conflict of interest became apparent to Judge Tidd. That Judge Tidd’s act of entering judgment was ministerial, rather than judicial, also militates against a finding of a violation of Old Rule 8(A)(2) or Old Rule 14. The Board also cites to a list of cases where Judge Tidd provided representation of bankruptcy clients where the debtors had judgments against them rendered in his district court.[23] These bankruptcy representations occurred before the United States Bankruptcy Court for the Eastern District of Pennsylvania, a part of the judicial branch of our federal government. Additionally, the Board introduced the case of Capital One Bank v. Leslie Ziegler, No. MJ-03204-CV-190-2011, where Judge Tidd began a representation of Ms. Ziegler as a bankruptcy client while a civil case against her was pending in his court. On December 15, 2011, two days following him being retained as bankruptcy counsel, Judge Tidd had the Capital One case transferred to another district court. Prior to this time, Judge Tidd had sought ethical advice concerning whether certain cases presented ethical conflicts. On September 25, 2011, Judge Tidd had received a letter response from the Ethics and Professionalism Committee of the Special Court Judges Association of Pennsylvania (“Ethics Committee”), which addressed the ethical considerations in cases where a debtor against whom was a judgment from Judge Tidd’s court later sought to retain him as bankruptcy counsel. The Ethics Committee letter highlighted the considerations as reflected by'the text of Old Rules 14 and 8A(2), but did not de-dare that serving as bankruptcy counsel would necessarily constitute a violation.[24] The Board asks this Court to declare that the representation by an attorney-MDJ of a client in a bankruptcy proceeding where the debtor-client has among their creditors a debt reduced to judgment in the MDJ’s district court is a violation of Old Rule 14, (and essentially also a violation of the current applicable provision, Rule 3.10(E)(3)).[25] New Rule 3.10(E) provides that “Magisterial District Judges who are also attorneys shall not practice law: ... (2) in any proceeding in which they have served as magisterial district judge; (3) .in any proceeding related to a proceeding in which they, served as a magisterial district judge.” In so doing, the Board would have us reach the conclusion that a bankruptcy petition by a debtor who has suffered a judgment against him is “a proceeding related to” the earlier-occurring MDJ action. Because Judge Tidd acted promptly to rectify what we consider to be a minor, technical violation of Old Rule 14 with respect to his representation of Leslie Ziegler,[26] we decline to reach , a conclusion that his conduct would be a sanctionable violation of,Old Rule 14. In our view, attorney-MDJs may likely confront such situations from time- to time, depending on the area of law in which they practice. Avoidance of violations requires a routine, methodical means of ascertaining potential'conflicts, dnd while every system will prove imperfect, substantial compliance also includes prompt action to resolve instances where a conflict is not detected in advance. Judge Tidd testified about his efforts to avoid conflicts, and we accept his testimony as honest and forthright, leading us to the conclusion that while the Zeigler matter might have constituted a violation had Judge Tidd not taken the decisive actions of transferring the case to another district court and also ceasing acting as counsel to Ms. Zeigler, his actions here resolved any violation. The Note to Old Rule 14 states that “[t]his rule contains all the prohibitions upon the practice of law by attorney magr isterial district judges that were thought necessary.” Attorney Tidd’s representation as bankruptcy counsel of various debtors who happened to have judgments against them that Judge Tidd had entered were neither continuations of those civil proceedings, nor were they “related to” the cases in which Judge Tidd had entered judgment in his court. Rather, they were eases filed in an entirely different judicial system, with an entirely different judiciary, serving an entirely different purpose. In many of the cases cited by the Board periods of several months to nearly three years had passed between the entry of judgments and Attorney Tidd representing the debtors in filing bankruptcy petitions. In several cases cited, there were ás little as three months, and as many as 34 months, that had passed. In two instances, the .matter was currently pending before Judge Tidd’s district court, and the matters were promptly transferred to another district court. These facts serve to illustrate the chai-lenges faced by attorney-MDJs when practicing law in our less-populous counties, and in particular fields of law such as consumer bankruptcy, where such conflicts are likely to arise. As members of the judiciary, we view them as having a special obligation to be punctiliously diligent in avoiding such conflicts in order that any appearance of impropriety in our judicial system is avoided. We decline to define the representation, by an attorney-MDJ of a debtor in a bankruptcy action in the United States Bankruptcy Courts where the debtor has among their debts a judgment rendered in the MDJ’s district court as a per se violation of Old Rule 14(A) or Rule 3.10(A), or Old Rule 3.. Had our Supreme Court intended to proscribe practice in the federal courts ..by attorney-MDJs they would have included such a prohibition in the applicable Rules. Moreover, the different purposes served by the federal court system and in particular the U.S. Bankruptcy Courts make it less likely that the involvement by an attorney who is also a MDJ will cast any shadow on the Commonwealth judiciary-.[27] Accordingly, we see no violations in Counts 7 or 8 concerning Judge Tidd serving as attorney in the cases cited herein. We also see no violation for failure to prioritize his judicial activities connected to Isolated incidents of Judge Tidd agreeing, to represent several litigants in Bankruptcy proceedings while they had civil cases, pending in his magisterial .district. Judge Tidd testified credibly that his, law office routinely conducted multi-step conflicts checks and that he had attempted to ascertain the existence of conflicts in these several matters. In those several instances where he agreed to represent clients in bankruptcy proceedings at a time when they did have matters pending in his magisterial district, the cases were promptly transferred to another district court. This, along with seeking the ethical advice that he did, we view as substantial compliance with Old Rule 3. D. Failure to Wear Judicial Robes, Disregard for Dignity of Judicial Robes In Count 9, the Board alleges that Judge Tidd violated Old Rule 4B, which provides that magisterial district judges “shall wear judicial robes while conducting hearings and trials.” In Count 10, the Board alleges that Judge Tidd violated Rule 2A, that magisterial district judges shall “conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” To the extent that the Board’s allegation in Court 9 relates to the plea discussions covered at length herein in Part B, we have already determined that what occurred in nearly all instances were not trials, but rather were plea discussions and guilty pleas or conferences resulting in consented-to civil judgments. Judge Tidd was not obligated to wear his judicial robes during such discussions. The testimony at trial regarding one instance where Judge Tidd had used his robe as a pillow for a nap on the floor of his chambers was necessitated by serious illness and does not constitute any ethical violation. Here, we see no evidence rising to the clear and convincing standard that proves the allegations of Counts 9 or 10. E. Counts 11, 12 and 13. Derivative Violations. Counts 11, 12 and 13 allege derivative violations premised upon findings of misconduct in Counts 1 through 10. Because we find Judge Tidd in violation of Rule 2.16(B) concerning retaliation against a person known or suspected to have assisted or cooperated with an investigation by the Board, he is automatically in violation of Count 11 (Pa. Const. art. V, § 17(b) (“shall be governed by rules or canons which shall be prescribed by the Supreme Court”)). Having seen no prejudice to the administration of justice or disrepute to the overall judiciary, we find no violation in Counts 12 or 13. IV. Conclusions of Law As set forth above, we find: 1. Respondent’s conduct constitutes a violation of MDJ Rule 2.16(B); 2. Respondent’s conduct constitutes a violation of Pa. Const. art. V, § 17(b) (relating to MDJs “shall be governed by rules or canons which shall be prescribed by the Supreme Court”); 3. The Board has failed to prove the remaining charges by clear and convincing evidence. ORDER OF COURT PER CURIAM AND NOW, this 15th day of December, 2017, based upon the Conclusions of Law set forth above, it is hereby ORDERED: 1. Pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and is hereby filed, and shall be served on the Judicial Conduct Board and upon the Respondent; 2. Either party may file written objections to the Court’s Conclusions of Law within ten (10) days of this Order. Said objections Shall include the basis therefor- and shall be served on the opposing party; 3. If objections are filed, the Court may schedule oral argument on the objections; 4.If objections are not filed within ten (10) days, the Findings of Fact and Conclusions of Law shall become final; 5.The Court will schedule a sanctions hearing joy further Order. . During the time spanning these allegations the Supreme Court adopted revised Canons of Judicial Conduct and MDJ Rules. This case involves both the old and new MDJ Rules. The revised MDJ Rules were adopted on September 18, 2014 and took effect on December 1, 2014. For clarity, we reference the prior MDJ Rules as "Old Rule(s),” and current MDJ Rules as either "New Rule(s)” or "Rule(s).” . The trial panel consisted of Judge David Barton, Conference Judge, and Judges Jeffrey Minehart and Michael Barrasse. . The Exhibit at Exhibit Binder Tab # 86, relating to the case of Commonwealth v. Hazeltine, was removed from the book and neither introduced nor admitted into evidence. (See N.T. 1/20/17, p. 454.) . While there were many exhibits admitted without objection, not all exhibits were the subject of testimony at trial. . In addition, facts recited in the Introduction and various Discussion sections also constitute factual findings. . At trial, Anthony denied having spoken with David Repyneck, Tidd's opponent in the May 19, 2015 primary election, prior to April 23, 2015. (N.T. 1/20/17, p. 430). Anthony testified that Repyneck telephoned her and inquired about court operations and the progress of the Board’s investigation of Tidd prior to the 2015 primary election. Id. However, a Board Investigative Report used in cross-examination of ACA French suggested that it was Anthony who had contacted Repyneck and this occurred on several occasions. We take judicial notice of our Supreme Court’s policy regarding Prohibited Political Activity By Court-Appointed Employees, 204 Pa. Code § 29.472, and conclude Anthony’s conduct likely violated this important limitation. We also find this discrepancy important in our determination of the credibility of witnesses. .While there are many cases where a judge’s conduct toward staff has resulted in the imposition of judicial discipline, we have found none that concern retaliation for complaining or cooperating with the disciplinary authority. ■ Rather, the discipline in those cases arose from the initial acts of the judge. See, e.g., In re Lokuta, 964 A.2d 988 (Pa. Ct. Jud. Disc. 2008); In re Berkhimer, 877 A.2d 579 (Pa. Ct. Jud. Disc. 2005). . 1 Pa, C.S.A. §§ 1501-1991. . See, e.g., Rernp v. Alcon Laboratories, Inc., 701 Fed.Appx. 103 (3d Cir. 2017) (non-prece-dential) (raising claims under 42 U.S.C. § 2000e-2 ("Title VII"); 43 Pa. C.S. § 953 ("PHRA”); 29 U.S.C. § 623 ("ADEA”)). Retaliation also arises in prisoner civil rights litigation. . In prisoner civil rights litigation the federal courts have adopted a similar test. See, e.g., Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (claim for retaliation under 42 U.S.C. § 1983 requires proof that adverse action “was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights”). . The Court added: "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or physical acts performed.” Burlington, 548 U.S. at 69, 126 S.Ct. 2405 (quoting Oncale v. Sundowner Offshore Service, Inc., 523 U.S. 75, 81-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). In judicial discipline cases this “constellation” .of surrounding circumstances will always involve a detailed, fact specific analysis. .MDJ’s are elected to six year terms of office, and unlike all other judicial officers face competitive elections, rather than retention elections, for subsequent terms. See Pa. Const. art. V; 42 Pa. C.S.A. § 3152. . We address Counts 2, 3 and 6 together because they arise mainly from the same operative facts. . Judge Tidd's staff members testified, however, that on no occasions did they see a witness being sworn to give testimony. The absence of this step leads us to our conclusion herein that what occurred were not actual summary trials. . See also Fn. 6, p. 1157. . We see no demeanor violations concerning Judge Tidd having conducted the pre-trial conferences and plea discussions discussed infra. In concluding that Judge Tidd’s other conduct did not violate Old Rule 4(c) or New Rule 2.8(b) (demeanor), we do not look to the retaliatory conduct, infra, as we feel that conduct is fully addressed within the retaliation violation, The remaining allegations concerning demeanor were not proved to the clear and convincing standard, , If a judge makes the decision that he or she can be impartial, the judge must, nonetheless, "decide whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make.” Lomas v. Kravitz, 130 A.3d 107, 122 (Pa, Super, 2015) (internal citations and quotation marks omitted) (affirmed, — Pa. —, 170 A.3d 380 (2017)); Com. v. Watkins, 630 Pa. 652, 108 A.3d 692 (2014); Com. v. Kearney, 92 A.3d 51 (Pa. Super. 2014). . The Code of Judicial Conduct, and MDJ Rules, both permit and encourage judges to engage in activities likely to involve close interaction with members of the bar. See, e.g., Comment 1 to Rule 3,1, Pa. C. Jud. Cond. ("... judges are encouraged to engage appropriate extrajudicial activities ... that concern the law ... by speaking, writing, teaching, or participating in scholarly research projects.”); Comment 2 ("Participation ... helps integrate judges into their communities .....”); Rule 3.4 ("A .., judge may serve as a member, officer, or director of an organization or governmental agency devoted to the improvement of the law, the legal system, or the administration of justice.”); and MDJ Rules 3.1, 3.4, and 3.7 (same). See also, Randall T. Shepard, Judicial Professionalism and the Relations between Judges and Lawyers, 14 NO-TRE DAME J. OF LAW, ETHICS & PUB. POL. 223 (2000). .Our Commonwealth's magisterial district judges are elected in their local districts and typically know and are known by much of the citizenry residing in these districts. The Board would be hard pressed to find a district judge who has not interacted with a litigant at a grocery store or other business in the community where he or she was elected. This is not special consideration, and so long as the substance of the case is not discussed, is also not an improper ex parte communication. . Rule 3.10(A) tracks Old Rule 14A, and provides that "Attorneys who are not magisterial district judges shall not ... act as a lawyer in a proceeding in which they have served as a magisterial district judge or in any other proceeding related thereto.” . Old Rule 3 provides that the judicial duties of a magisterial district judge "shall be given priority over any other occupation, business, profession, pursuit or activity.” 42 Pa. C.S.A. . The Board’s Exhibit No. 30 is a docket transcript along with the District Court’s complete file. The Civil/Landlord Tenant Worksheet, likely completed by Judge Tidd, reflects that no intention to defend was entered, no parties were present and judgment was entered for plaintiff. Under Pa. R.C.P.M.D.J. No. 319, a default judgment should have been entered, and we treat it as such. .Equable Ascent Financial, LLC, v. Cortez, (CV-190-11) (Bankruptcy ("BR”) Petition filed 34 months after MDJ judgment); Equable Ascent Financial LLC, v. Cortez, (CV-138-12) (BR petition filed 18 months after MDJ judgment); Security Credit Services v. Cortez, (CV-123-13) (BR petition filed 12 months after MDJ judgment); Target National Bank v. Pagel, (CV-2S-12) (BR petition filed 11 months after MDJ judgment); PPL Electric v. Craig, (CV-162-12) (BR petition filed 3 months after MDJ judgment); Discover Bank v. L. Deschler, (CV-175-12) (BR petition filed 8 months after MDJ default judgment); Discovery Bank v. T. Deschler, (CV-9-13) (BR petition filed 6 months after MDJ default judgment); DeWire Dental LLC v. Cruz, (CV-105-13) (BR petition filed during pendency of MDJ action); Calvary SPV I, LLC, v. Killo, (CV-144-13) (BR petition filed 12 months after MDJ default judgment); FFIF-ACM-Opportunity Fund v. Killo, (CV-173-13) (BR petition filed 8 months after MDJ default judgment); First Commonwealth FCU v. Frey, (CV-58-14) (BR petition filed during pendency of case, case transferred to another MDJ). Board’s Brief and Prop. F.F. and Cone, of Law, at 131. .We a're obligated to take into account the fact that a judge sought and then followed an opinion from the Ethics and Professionalism Committee of the Special Court Judges Association where the judge then acted in reliance upon the written opinion rendered. See Preamble to Rules Governing Standards of Conduct of Magisterial District Judges, ¶ 8. . The old and new rules have essentially identical provisions as applicable here. Old Rule 8(A)(2) provides that MDJs shall disqualify themselves ‘‘in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where .... (2) they served as a lawyer in the matter in controversy .... ” . At trial, testimony revealed that Ms. Zeig-ler was later wedded to the man who in 2015 sought election to Judge Tidd’s position. We find troubling the apparent motivation behind Zeigler’s April, 2015 complaint concerning acts that occurred in 2010 and 2011. . The rules of certain federal District Courts limit attorney-MDJs from practicing criminal law, but have stopped short of imposing the same limitation on the civil side of the federal courts or in the Bankruptcy Courts. See L.Cv.R. 83.2(A)(5)(f) (U.S.D.C., W. D. Pa.).